2011 Ark. App. 4

**Brian CHARLAND, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 10–365.**

Court of Appeals of Arkansas.

Jan. 5, 2011.

Sharon Kiel, Little Rock, for appellant.

Deborah Nolan Gore, Little Rock, for appellee.

ROBERT J. GLADWIN, Judge.

On February 27, 2009, appellant Brian Charland was convicted by a Carroll County jury of three counts of rape and sentenced to seventy-five years' imprisonment in the Arkansas Department of Correction. Appellant argues that the circuit court erred in failing to suppress statements he made because the investigating officers violated Arkansas Rule of Criminal Procedure 2.3 (2009) by failing to inform him that he was under no legal obligation to comply with their request to accompany them to the station and give a statement. We affirm.

*Facts*

On October 17, 2007, Officer Kevin Disheroon, a patrolman with the Berryville Police Department, was called out to investigate a complaint by a neighbor that a seven-year-old girl, A.C., had been raped by her father. Disheroon spoke with the complainant and a group of neighbors, adults and children, who had gathered. He was directed to appellant's home, where he found appellant and appellant's wife outside in the front yard. A.C. was next door with a neighbor and was visibly upset. Disheroon explained to appellant why he was there and indicated that an investigator would be out the next day to speak with them.

Subsequently, Michelle Gatlin, an investigator with the Arkansas State Police Crimes Against Children Division, interviewed A.C. Gatlin testified that during the interview, A.C. defined rape as "when the dad has sex with his little girl" and defined sex as "when the dad makes the little girl suck on his private," although she did not say that appellant had raped her. A.C. also stated to Gatlin, "my dad told me that, if it did happen, that it would only be one time, and that he would have to go to jail." Gatlin conveyed this information to Disheroon and the next day they went back to appellant's residence. When Disheroon and Gatlin asked to enter the residence, they were let in. Disheroon was armed and in uniform, and he remained at the front door. Gatlin interviewed appellant's wife, April Charland, in her bedroom.

Upon completion of the interview, appellant was asked to go to the police station to give a statement, and he drove there in another car with his wife. At the police station, appellant received *Miranda* warnings, after which he gave written and videotaped statements incriminating himself, specifically confessing that he had A.C. perform oral sex on him.

■ Appellant filed a motion to suppress his statements, and a suppression hearing was held on March 10, 2008. Disheroon and Gatlin testified for the State, and appellant's statements were deemed admissible.[1] At the subsequent

---

1. The testimony cited herein is from both the suppression hearing and the trial. This court may rely on trial testimony to affirm the circuit court's suppression ruling. *See Howell v. State*, 350 Ark. 552, 89 S.W.3d 343 (2002) (voluntariness of statement), *overruled on other grounds by Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003); *but see Blevins v. State*, 95 Ark. App. 218, 235 S.W.3d 921 (2006). The State urges that the *Blevins* court's hesitancy to rely on *Howell* in light of *Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999), is mistaken. *Riggs* rejected an effort to rely on trial testimony to reverse a ruling,

three-day jury trial that began on February 25, 2009, Disheroon and Gatlin again testified regarding the investigation and resulting statements from appellant.

Appellant testified at the trial, asserting that, when faced with the prospect of losing his children and not knowing what else to do, he felt compelled to say something, to do anything—even risk incarceration at the police station—in an effort to keep the children at home with his wife. He maintained that his statements were completely fabricated.

The jury found appellant guilty of all three counts of rape and sentenced him to twenty-five years' imprisonment on each count, to be imposed consecutively for an aggregate sentence of seventy-five years. A judgment and commitment order was entered on March 18, 2009. Defendant filed a motion for a new trial on April 17, 2009, and after no action was taken by the circuit court, appellant filed a notice of appeal on May 13, 2009.

*Standard of Review and Applicable Law*

■ ⌊4⌋When reviewing the trial court's denial of a motion to suppress, this court conducts a de novo review based on a totality of the circumstances, reviewing findings of historical fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *LeFever v. State*, 91 Ark. App. 86, 208 S.W.3d 812 (2005).

A law-enforcement officer may request any person to appear at a police station in order to furnish information or otherwise cooperate in the investigation of a crime. Ark. R.Crim. P. 2.2(a) (2010). In making a request pursuant to the rule, no law-enforcement officer shall indicate that a person is legally obligated to furnish information or to otherwise cooperate if no such legal obligation exists and compliance with the request for information or other cooperation shall not be regarded as involuntary or coerced solely on the ground that such a request was made by a law-enforcement officer. Ark. R.Crim. P. 2.2(b) (2010). If a law-enforcement officer acting pursuant to this rule requests any person to come to or remain at a police station he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request. Ark. R.Crim. P. 2.3 (2010).

■ If a police officer has probable cause to arrest, failure to give a Rule 2.3 warning is irrelevant. *See Efurd v. State*, 334 Ark. 596, 976 S.W.2d 928 (1998); *State v. Bell*, 329 Ark. 422, 948 S.W.2d 557 (1997). Probable cause exists when there is reasonably trustworthy information within a law-enforcement officer's knowledge that would lead a person of reasonable caution to believe that a felony was committed by the person detained. *Efurd, supra*. ⌊5⌋The test for determining probable cause rests on the collective information of the officers and the degree of proof required to sustain a conviction is not required for probable cause to arrest. *Id.*

Arkansas Rule of Criminal Procedure 3.1 (2010) provides in part that an officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit a felony, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under Rule 3.1 may require the person to remain in or near such place in the officer's presence for a period of not

id. at 127 n. 2, 3 S.W.3d at 314 n. 2, not to affirm, as the State asks here.

more than fifteen minutes or for such time as is reasonable under the circumstances. *Id.* At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense. *Id.*

### Discussion

■■ Rule 2.3 does not require a verbal warning of freedom to leave as a bright-line rule for determining whether a seizure of the person has occurred under the Fourth Amendment and whether a statement to police officers must be suppressed. Rather, a verbal admonition of freedom to leave has been interpreted as one factor to be considered in the analysis of the total circumstances surrounding compliance with Rule 2.3. Our supreme court stated in *Bell, supra,* that it would follow *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), in these situations. Specifically, the analysis is whether a reasonable person would feel that they were free to leave notwithstanding the police presence and request. Examples of circumstances that were listed in *Mendenhall* that might indicate a person was not free to leave included the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Mendenhall, supra.* In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. *Id.* In *Bell, supra,* the defendant was told that he did not have to comply with the officer's request to go to the police station on a particular day, although he chose to go. This was followed by a second request three days later, with no accompanying warning regarding compliance, which re-

sulted in a second statement, polygraph, and arrest on murder charges.

Appellant acknowledges that a more invasive police stop is permitted under Rule 3.1. But he notes that in order for Rule 3.1 to be implicated to allow officers to detain an individual, officers need to inquire about a particular felony in which that person has been involved, is involved, or will become involved. *See Meadows v. State,* 269 Ark. 380, 602 S.W.2d 636 (1980). He also reiterates that at the end of a Rule 3.1 stop, officers must have probable cause to arrest the detainee, or let him go.

Appellant does not maintain that he was under arrest the moment Gatlin and Disheroon entered his residence on October 18, 2007, instead acknowledging that he was subject to a proper investigatory stop pursuant to Rule 3.1. Appellant explains that when Gatlin or Disheroon, for whatever reason, declined to arrest him at the end of a reasonable duration and alternatively asked him to come to the police station, they failed to inform him that he was under no legal obligation to comply with such a request. He claims that the events that preceded his going to the police station would have led a reasonable person to believe he was not free to leave, in violation of Rule 2.3. Specifically, appellant submits that a reasonable person would find that a uniformed police officer near the front door of the home, even if let in voluntarily, could give the impression that there is a police action underway and that he could not leave.

We disagree. Officers proceeded properly under Rule 3.1 in returning to appellant's residence to further investigate. Disheroon received the initial information regarding the alleged rape via a third party and interviewed the victim and her parents the same evening. Those facts alone warranted a Rule 3.1 investigatory stop of

appellant the following day by Disheroon. Officers had sufficient reason to turn their return visit to appellant's residence the following day into a Rule 3.1 visit—specifically, A.C.'s disturbing, father-based, genital-specific definitions of sex and rape that were significantly different than what would be considered the social norm.

■■■ At the conclusion of the visit, Disheroon asked appellant if he would come to the police station to give a statement, and appellant proceeded to do so in a separate vehicle with his wife. The fact that appellant was not given the Rule 2.3 warning is but one factor to be considered in examining whether a seizure of the person has occurred under the Fourth Amendment and whether a statement to police officers must be suppressed. *See Baker v. State*, 363 Ark. 339, 214 S.W.3d 239 (2005); *Bell, supra; LeFever, supra.* The rule does not require an explicit statement that one is not required to accompany the police; rather, the police only need to take such steps as are reasonable to make clear that there is no legal obligation to comply with the request to come to the police station. *See Flanagan v. State*, 368 Ark. 143, 243 S.W.3d 866 (2006). Here, the testimony offered at both the suppression hearing and the trial supports the conclusion that Disheroon complied with those requirements.

■■■ Disheroon testified that he waited inside the doorway of appellant's home while Gatlin interviewed appellant's wife. He testified that appellant continued to play video games and listen to music with his brothers and that he did not menace appellant or threaten him in any way. He stated that his interactions with appellant were "very cordial, very polite." Appellant agreed, describing his conversation with Disheroon as "nonchalant."

When Gatlin, who was in plain clothes, concluded her interview with appellant's wife, Disheroon asked appellant if he would be willing to come to the police department to give a statement, appellant responded, "sure, no problem." Appellant, in his testimony, corroborated this, stating, "I [did not] see a problem with it." He added, "I [did not] think there was any issue, so I went ahead·and told them I'd go." It is unclear if the officers were in a marked or unmarked car, and appellant fails to indicate how long the officers were on the premises.

Appellant and his wife then traveled to the police station together in their own vehicle. Appellant testified that his motivation to confess stemmed from a conversation he had with his wife en route to the police station. He explained that he believed confessing to the crime was the only way to keep his children in the home, although he admitted that the police never threatened to take his children away.

Additionally, it is undisputed that appellant was advised in writing of his *Miranda* rights, and he signed a form waiving those rights before he gave his oral and written confessions that he raped A.C. The evidence before us demonstrates that Disheroon took such steps as were reasonable to make clear that appellant had no legal obligation to comply with a request to come to the police station and make a statement. Accordingly, there was no unreasonable seizure or detention that warranted the suppression of appellant's confessions. Based upon our de novo review on the totality of the circumstances, we hold that the circuit court did not err in denying appellant's motion to suppress.

Affirmed.

PITTMAN and ABRAMSON, JJ., agree.