James Brian STEVENS  *v.*  STATE of Arkansas

CA CR 04-986                                                208 S.W.3d 224

Court of Appeals of Arkansas
Opinion delivered May 11, 2005

*Miller Law Firm,* by: *Leslie Borgognoni* and *Randel Miller,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Karen Virginia Wallace,* Ass't Att'y Gen., for appellee.

JOHN B. ROBBINS, Judge. Appellant James Brian Stevens entered conditional guilty pleas to possession of methamphetamine with intent to deliver and possession of drug paraphernalia, and was sentenced to eighty-four months' probation. Pursuant to Ark. R. Crim. P. 24.3(b), Mr. Stevens reserved his right to appeal from the judgment, and now challenges the trial court's denial of his motion to suppress the incriminating evidence. He contends that the search of his home violated his Fourth Amendment right against unreasonable searches and seizures. We affirm.

Officer Scott Pillow was the only witness to testify at the suppression hearing. He testified that he executed a search warrant at a residence in Paragould at about 3:00 p.m. on January 23, 2003. During the search, he seized four grams of methamphetamine and arrested three men. At the police station, Officer Pillow obtained statements from two of the individuals after advising them of their Miranda Rights. According to Officer Pillow, one of the men

stated that he was present at the home of Mr. Stevens on the previous evening when he observed another person purchase approximately one-eighth of an ounce of methamphetamine from Mr. Stevens. The other man advised Officer Pillow that he had been to Mr. Stevens' residence on numerous occasions; that he had purchased two "eight-balls" of methamphetamine from Mr. Stevens in the past twenty-four hours; and that Mr. Stevens always had methamphetamine to sell. Officer Pillow indicated that these individuals were interviewed separately.

A photograph of Mr. Stevens' residence was subsequently shown to the first man who gave a statement, and he identified it as the residence where he witnessed the drug transaction. The second man was transported to the residence, and he correctly identified it as Mr. Stevens' home.

On cross-examination, Officer Pillow acknowledged that he had no past experience with the men he arrested and could not vouch for their reliability. Officer Pillow also indicated that while he was inquiring about where the men obtained the methamphetamine, he told them he would relay the information to the prosecutor. Officer Pillow testified that he had no information on Mr. Stevens prior to this time, that there had been no surveillance of his home, and that "there was nothing else to bolster these folks' statements to me."

At 6:25 p.m. on January 23, 2003, Officer Pillow presented an affidavit for search warrant to a magistrate, wherein he set forth the following facts:

> The undersigned, being duly sworn, deposes and says he has reason to believe that on the premises known as the Brian Stevens residence located at 1823 East Kingshighway in Paragould, AR, State of Arkansas there is now being concealed certain property namely, methamphetamine, records concerning the manufacturing and distribution of controlled substances and items used to weigh, package, manufacture and consume controlled substances which are being possessed illegally as described in the Uniform Controlled Substances Act of the Arkansas State Statues.

> The residence is described as an apartment complex directly behind 1821 East Kingshighway. The residence is believed to be 1823 East Kingshighway in Paragould, AR. The apartment to be searched is a bottom apartment, with a white door facing the west. No number is present. Two separate individuals have identified the apartment. (See attached photograph of the residence)

And the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

FACT #1 — My name is Special Agent SCOTT PILLOW and I have been employed by the Arkansas State Police since November of 1994 and I have been a certified Police Officer since 1991. I have been assigned to the Criminal Investigation Division of the Arkansas State Police since February 1999. I have also served on a United States Drug Enforcement Administration Task Force, serving as a deputized DEA agent since being assigned to the C.I.D. division of the Arkansas State Police. My primary duties are concerned with the detection and control of illegal drug operations in the State of Arkansas. In this capacity I have directed numerous investigations using undercover police officers, confidential informants and other investigative techniques. I have worked with local, state and federal agencies and from all this I have gained a good working knowledge of the illegal drug trafficking in Arkansas.

FACT #2 — On January 23, 2003, I executed a search warrant at 808 East Unity Road. Seized during the search warrant was approximately 4 grams of methamphetamine. Also three individuals were arrested at this time.

FACT #3 — After the above individuals were arrested, one stated that he was present last night while approximately 1/8 ounce of methamphetamine was purchased from Brian Stevens at the above described residence. This individual gave me self-incriminating statements about his own involvement in the use and distribution of controlled substances that could result in his incarceration and these type statements tend to show truthfulness. The police have no reason to disbelieve the information.

FACT #4 — One of the other individuals arrested stated that he purchased methamphetamine from Stevens at the above described residence on numerous occasions and has purchased methamphetamine from Stevens twice within the past twenty four hours, having purchased two "eightballs" of methamphetamine from Stevens. The individual also stated that Stevens always has methamphetamine in his possession to sell. This individual gave me self-incriminating statements about his own involvement in the distribution and use of controlled substances and these type statements tend to show truthfulness. The police have no reason to disbelieve the information.

Based on the affidavit the magistrate issued a warrant to search Mr. Stevens' home, and during the search the police found methamphetamine and other contraband.

After the suppression hearing, the trial court denied Mr. Stevens' motion to suppress. In denying the motion, the trial court relied on the good-faith exception to the exclusionary rule as set out in *United States v. Leon*, 468 U.S. 897 (1984).

Mr. Stevens now argues that the trial court erred in applying the good-faith exception, and that the search of his home was illegal. He cites Ark. R. Crim. P. 13.1(b), which provides:

> The application for a search warrant shall describe with particularity the persons or places to be searched and the person or things to be seized, and shall be supported by one (1) or more affidavits or recorded testimony under oath before a judicial officer particularly setting forth the facts and circumstances tending to show that such persons or things are in the places, or the things are in possession of the person, to be searched. If an affidavit or testimony is based in whole or in part on hearsay, the affiant or witness shall set forth particular facts bearing on the informant's reliability and shall disclose, as far as practicable, the means by which the information was obtained. An affidavit or testimony is sufficient if it describes circumstances establishing reasonable cause to believe that things subject to seizure will be found in a particular place. Failure of the affidavit or testimony to establish the veracity and bases of knowledge of persons providing information to the affiant shall not require that the application be denied, if the affidavit or testimony viewed as a whole, provides a substantial basis for a finding of reasonable cause to believe that things subject to seizure will be found in a particular place.

Mr. Stevens submits that there was no reasonable cause to issue the search warrant because the reliability of the two informants was not established, and there was nothing else in the affidavit to establish a belief that contraband would be found in his home.

Mr. Stevens acknowledges that in *United States v. Leon, supra,* the Supreme Court held that an officer's objective, good-faith reliance on a facially valid warrant will avoid application of the exclusionary rule in the event that the magistrate's assessment of probable cause is found to be in error. This is because the exclusionary rule is designed to deter police misconduct rather than to punish errors of judges and magistrates. *Sanders v. State*, 76

Ark. App. 104, 61 S.W.3d 871 (2001). However, Mr. Stevens asserts that Officer Pillow was not acting in objective, good-faith reliance. He notes that it was the State's burden to establish applicability of the good-faith exception, *see Hoay v. State*, 348 Ark. 80, 71 S.W.3d 573 (2002), and contends that the State failed to meet its burden.

The good-faith exception cannot cure certain errors, namely: (1) when the magistrate is misled by information the affiant knew was false; (2) if the magistrate wholly abandons his detached and neutral judicial role; (3) when the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when a warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. *United States v. Leon*, 468 U.S. at 914–15. Mr. Stevens submits that all but the first of the above four errors were present in this case.

Mr. Stevens notes that Officer Pillow testified that "the judge took not more than fifty-nine seconds to review the affidavit and sign the search warrant," and argues that this alone defeats application of the good-faith exception. Mr. Stevens contends that no reasonable police officer could believe that this is the type of neutral, informed, deliberate, and detached scrutiny required for the issuance of a warrant to search a person's home under the Constitution.

Mr. Stevens further maintains that, under the circumstances of this case, the affidavit was entirely lacking and the warrant was so facially deficient that a reasonable officer could not presume it to be valid. In addition to the fact that the veracity of the informants was not established, Mr. Stevens asserts that there was nothing to corroborate or bolster their statements. He notes that there was no attempt to survey the house, such as looking for a high amount of traffic or attempting to execute a controlled buy. Mr. Stevens argues that the uncorroborated statements of the two arrested drug suspects cannot, alone, support application of the good-faith exception.

Mr. Stevens further argues that, even if the statements of the two arrestees had been trustworthy, the statements were nonetheless insufficient to justify the search. He cites *Yancy v. State*, 345 Ark. 103, 44 S.W.3d 315 (2001), where the supreme court stated that, standing alone, circumstantial evidence that a suspect may be a drug dealer is not circumstantial evidence that anything is in his

home. While both arrestees indicated that Mr. Stevens had sold methamphetamine in the past day, Mr. Stevens argues that this was insufficient to support the assertion in the affidavit that methamphetamine was being concealed in his home.

Mr. Stevens directs us to the ruling of the trial court, where after applying the good-faith exception the trial court stated, "It should go without saying that from this date forward Investigator Pillow is on notice that the court will not consider one informant's testimony as corroboration of another and that conclusory statements will not be considered." Mr. Stevens urges that this comment reflects that the deterrent effect of the Fourth Amendment will be applied to future instances of similar misconduct, but was not applied in the case at bar in violation of his constitutional rights.

We review a trial court's ruling on a motion to suppress by making an independent determination based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003). Under the totality of the circumstances in the instant case, we hold that the trial court committed no error in denying Mr. Stevens' motion to suppress.

■ Contrary to Mr. Stevens' argument, there were sufficient facts to establish the veracity of the second informant. Factors to be considered in making such a determination include whether the informant's statements are (1) incriminating; (2) based on personal observations of recent criminal activity; and (3) corroborated by other information. *Owens v. State*, 325 Ark. 110, 926 S.W.2d 650 (1996).

The second informant's statements were clearly incriminating as he admitted to purchasing methamphetamine from Mr. Stevens on numerous occasions, and twice within the past twenty-four hours. Moreover, the statements were based on personal observations of recent criminal activity, and there was some corroboration because the first informant gave a similar account of a recent methamphetamine buy at Mr. Stevens' home.

It has long been held that the self-incriminating nature of a statement is alone sufficient to establish its reliability. *See Schneider v. State*, 269 Ark. 245, 599 S.W.2d 730 (1980); *Gatlin v. State*, 262 Ark. 485, 559 S.W.2d 12 (1977); *Maxwell v. State*, 259 Ark. 86, 53

S.W.2d 468 (1976) ("We unhesitatingly find that the mere fact that Harris's statement was self-incriminating was an adequate basis for according reliability and credibility to the informant[.]"); *McCormick v. State*, 74 Ark. App. 349, 48 S.W.3d 549 (2001) (holding that the self-incriminating nature of the informant's statement was alone sufficient to establish its accuracy, where the informant's admissions could have led to his prosecution for possession of methamphetamine). Thus, in the case at bar the veracity of the second informant was established by the incriminating nature of his statements alone, and the affidavit containing his statements provided reasonable cause to believe that methamphetamine would be found in Mr. Stevens' residence. Based on our holding that the search warrant was supported by reasonable cause, it is unnecessary to determine whether there was any good-faith reliance on the part of Officer Pillow, as found by the trial court.

As to Mr. Stevens' argument that the search was illegal because the magistrate was not detached and neutral, we need not address this argument because it was not raised below. *See Raymond v. State*, 354 Ark. 157, 118 S.W.3d 567 (2003).

Finally, we find no merit to Mr. Stevens' argument that there was insufficient information that methamphetamine would be found in his home because the informants who made the purchases did not have knowledge that methamphetamine was there. The reliable, second informant not only purchased methamphetamine from Mr. Stevens, but the purchases were very recent and in Mr. Stevens' home, and he also indicated that Mr. Stevens always had methamphetamine for sale. This was ample information to give reasonable suspicion that methamphetamine would be found at the residence.

Despite the trial court's language admonishing Officer Pillow, we do not agree that the deterrent purposes of the Fourth Amendment were compromised in this case. This was because the affidavit presented by Officer Pillow gave reasonable cause to issue the search warrant, and there was no police misconduct to deter.

Affirmed.

HART, J., agrees.

GRIFFEN, J., concurs.

WENDELL GRIFFEN, Judge, concurring.

*If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring his right to be secure against such searches and seizures, is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.*
&mdash; *Weeks v. United States,* 232 U.S. 383, 393 (1914).

*Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.*
&mdash; *Brinegar v. United States,* 338 U.S. 160, 180 (1949) (Jackson, J., dissenting).

Like the trial judge, I believe that the affidavit in support of the search warrant in this case did not have sufficient information to support a finding of probable cause. For that reason, I would prefer to hold that anything seized by the police based on the warrant cannot be received into evidence. Unfortunately, precedent from our supreme court compels us to hold that the evidence seized based on that warrant was admissible under the good-faith exception to the exclusionary rule, as outlined in *United States v. Leon,* 468 U.S. 897 (1984). As a judge on the Arkansas Court of Appeals, I am bound by the decisions of the Arkansas Supreme Court concerning the good-faith exception. However, by concurring in this case, I am not retreating from my previous statements of strong disfavor for the "good faith" exception to the general rule that searches made pursuant to invalid search warrants are unreasonable under the Fourth Amendment. *See, e.g., Hampton v. State,* 90 Ark. App. 174, 204 S.W.3d 572 (2005) (Neal, J., dissenting); *Loy v. State,* 88 Ark. App. 91, 195 S.W.3d 370 (2004) (Neal, J., dissenting); *Crain v. State,* 78 Ark. App. 153, 79 S.W.3d 406 (2002) (Griffen, J., dissenting); *Hoay v. State,* 75 Ark. App. 103, 55 S.W.3d 782 (2001) (Griffen, J., concurring). Now, more than ever before, I am convinced that the good-faith exception operates to judicially sanction police conduct that violates the fundamental rights protected by the Fourth Amendment and serves to eviscerate the rules regarding search and seizure.

The Fourth Amendment to the United States Constitution declares:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment absolutely prohibits all unreasonable searches and seizures. The Amendment does not define what it means to be *unreasonable*, but it is well-settled that a warrantless search or seizure is presumptively unreasonable unless it falls under a narrow exception to the warrant requirement. *See, e.g., California v. Acevado*, 500 U.S. 565 (1991) (allowing for the warrantless search of a container located within an automobile, assuming there is probable cause for the search of said container, adopted in Arkansas in *Green v. State*, 334 Ark. 484, 978 S.W.2d 300 (1998)); *Horton v. California*, 496 U.S. 128 (1990) (allowing for the warrantless seizure of evidence of the crime in "plain view"; adopted in Arkansas in *Fultz v. State*, 333 Ark. 586, 972 S.W.2d 222 (1998)); *Chimel v. California*, 395 U.S. 752 (1969) (allowing for the warrantless search of a person and the area in the immediate control of a person incident to his or her lawful arrest; adopted in Arkansas in *Steel v. State*, 248 Ark. 159, 450 S.W.2d 545 (1970)).

To obtain a warrant, the Fourth Amendment *requires* probable cause, classically defined as "facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)) (internal quotations omitted). An affidavit for a search warrant must provide the magistrate with a substantial basis for determining the existence of probable cause. *Illinois v. Gates*, 462 U.S. 213 (1983). If that affidavit is based in whole or in part on the hearsay testimony of a confidential informant, then the affidavit must set forth facts bearing on the informant's reliability and, as far as practicable, the means by which the affiant received the information. *Id.*; *see also* Ark. R. Crim. P. 13.1 (2004). If the affidavit lacks sufficient indicia of reliability and the affidavit cannot stand on its own without those statements, then the affidavit contains insufficient facts to make a finding of probable cause. If the affidavit fails to allege sufficient facts to support a finding of probable cause, then any warrant issued based on that affidavit is invalid. A search based on an invalid warrant is the same as a search

without a warrant; thus, a search based on an invalid warrant is also unreasonable under the Fourth Amendment. This reasoning operates from the foundational principle that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures, shall not be violated. . . ."

The United States Supreme Court established an explicit rule excluding evidence resulting from an unconstitutional search. *See Weeks v. United States*, 232 U.S. 383 (1914). The Court recognized that allowing the admission of illegally obtained evidence would operate to nullify the Fourth Amendment. *See id.* The Court first mandated that the States adhere to the Fourth Amendment. *Wolf v. Colorado*, 338 U.S. 25 (1949). Later, the Court held the exclusionary rule applicable to the States as well. *Mapp v. Ohio*, 367 U.S. 643 (1961). The *Mapp* Court recognized that the pursuit of remedies other than the exclusion of the illegally seized evidence had proven "worthless and futile." *Id.* at 652. Even though the Fourth Amendment was unable to "cure the invasion of the defendant's rights which he had already suffered," *Stone v. Powell*, 428 U.S. 465, 540 (White, J., dissenting), the exclusionary rule was still a remedy that could operate to deter police misconduct. To that point, the law was clear: illegally seized material was inadmissible against a person whose Fourth Amendment rights were violated. The clear and deliberate aim of the exclusionary rule was to deter illegal police conduct and protect the individual rights.

It now appears that the goal of vindicating Fourth Amendment liberties has either been callously abandoned or wilfully subjugated to law enforcement aims at the cost of fundamental rights. Rather than punishing Fourth Amendment violations by excluding illegally seized items and upholding the liberties protected by the Amendment, the Court began balancing those liberties against other interests. In *United States v. Calandra*, 414 U.S. 338 (1974), the Court concluded that use of the exclusionary rule in the use of a grand jury proceeding would interfere with the grand jury's duties and held that a witness could not refuse to answer a question on the ground that the question was based on evidence obtained from an illegal search. In *Stone v. Powell*, 428 U.S. 465 (1976), the Court held that a prisoner could not be afforded federal *habeas corpus* relief on the ground that illegally seized evidence was introduced at trial if the State provided an opportunity to litigate the ground at trial. There, the Court stated

that enforcement of Fourth Amendment rights through the use of the exclusionary rule was minimal compared to "the substantial societal cost of application of the rule." *Id.* at 495.

The Supreme Court has refused to apply the exclusionary rule in even the most egregious of Fourth Amendment violations. In *United States v. Payner*, 447 U.S. 727 (1980), investigators for the Internal Revenue Service set up an operation to investigate the defendant, whom they suspected to be a narcotics trafficker. To that end, two investigators befriended a bank vice-president. One evening, while one investigator took the vice-president to dinner, the other investigator took the vice-president's briefcase from his hotel room and copied documents that were later used to obtain other documents implicating the defendant in efforts to falsify federal tax returns. The Court noted that "[n]o court should condone the unconstitutional and possibly criminal behavior of those who planned and executed this 'briefcase caper.'" *Id.* at 735. However, the Court refused to exclude the illegally seized evidence, holding that the defendant did not have standing to challenge the search because his reasonable expectation of privacy was not violated. By the time the Court decided *Leon*, the general rule of excluding illegally obtained evidence stood little chance of surviving. It was clear that the question was not, how can courts and judges enforce the Fourth Amendment, but, how much latitude will courts and judges accord the police despite the Fourth Amendment.

The phrase "good-faith exception" became a legal fiction as soon as the Supreme Court established it in *United States v. Leon*, *supra*. As already stated, the original rule was that evidence obtained from an illegal search or seizure is inadmissible at trial. *Mapp v. Ohio*, *supra*; *Weeks v. United States*, *supra*. Evidence seized pursuant to an invalid search warrant was considered illegally seized. After *Leon*, the evidence can only be excluded if (1) the magistrate is misled by information the affiant knew was false, (2) the magistrate "wholly abandoned his judicial role in the matter condemned," (3) the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant is "so facially deficient — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. The change allows law enforcement agents who lack probable cause to enter into private property and

seize incriminating material after applying to a magistrate for a search warrant, even when the warrant is based on false, misleading, and unreliable affidavits.

In *State v. Anderson*, 284 Ark. 509, 683 S.W.2d 897 (1985), our supreme court first recognized the significant change in Fourth Amendment jurisprudence as a result of *Leon*. *Leon* had its critics. Justice Purtle recognized that Arkansas was not obligated to follow federal law regarding the competency of evidence, quoting *State v. Browning*, 206 Ark. 791, 178 S.W.2d 77 (1944), and warned that adoption of the federal precedent would operate to legalize "all searches and seizures authorized and executed in good faith" regardless of Fourth Amendment implications. *Anderson*, 284 Ark. at 511, 683 S.W.2d at 898 (Purtle, J., dissenting). Justice Purtle's concerns were indeed prophetic.

*McFarland v. State*, 284 Ark. 533, 684 S.W.2d 233 (1985), is the case often cited for the Arkansas Supreme Court's adoption of *Leon* and the good-faith exception. There, the magistrate who issued the search warrant testified that the search warrants were not returned to him, as mandated by Ark. R. Crim. P. 13.4. However, the supreme court, with minimal discussion, found the searches reasonable and cited *Leon* in support of its conclusion. After *McFarland*, it appeared that the good-faith exception would truly be an "exception" in Arkansas, as the supreme court refused to apply it to salvage unconstitutional searches in *Stewart v. State*, 289 Ark. 272, 711 S.W.2d 787 (1986), and *Herrington v. State*, 287 Ark. 228, 697 S.W.2d 899 (1985).

However, my survey of cases since 1986 detected only nine published cases where Arkansas appellate courts did not apply the good-faith exception to salvage a search conducted pursuant to an invalid search warrant.[1] *See Bennett v. State*, 345 Ark. 48, 44 S.W.3d 310 (2001); *Stewart v. State, supra; Bogard v. State*, 88 Ark. App.

---

[1] This survey does not include eleven cases where the appellate court refused to apply the exception to an invalid nighttime search; however, our supreme court has refused to extend the exception to validate an illegal nighttime search. *See Fouse v. State*, 337 Ark. 13, 989 S.W.2d 146 (1999); *Richardson v. State*, 314 Ark. 512, 863 S.W.2d 572 (1993); *Garner v. State*, 307 Ark. 353, 820 S.W.2d 446 (1991); *State v. Martinez*, 306 Ark. 353, 811 S.W.2d 319 (1991); *Hall v. State*, 302 Ark. 341, 789 S.W.2d 456 (1990); *Dodson v. State*, 88 Ark. App. 380, 199 S.W.3d 115 (2004); *Heaslet v. State*, 77 Ark. App. 333, 74 S.W.3d 242 (2002); *Langley v. State*, 66 Ark. App. 311, 990 S.W.2d 575 (1999); *Zeiler v. State*, 46 Ark. App. 182, 878 S.W.2d 417 (1994); *Thompson v. State*, 42 Ark. App. 254, 856 S.W.2d 319 (1993); *Carpenter v. State*, 36 Ark. App. 211, 821 S.W.2d 51 (1991).

214, 197 S.W.3d 1 (2004); *Abbott v. State*, 307 Ark. 278, 819 S.W.2d 694 (1991); *Smith v. State*, 79 Ark. App. 79, 84 S.W.3d 59 (2002); *Jones v. State*, 73 Ark. App. 432, 44 S.W.3d 765 (2001); *Henry v. State*, 29 Ark. App. 5, 775 S.W.2d 911 (1989); *Lamb v. State*, 23 Ark. App. 115, 743 S.W.2d 399 (1988); *Ulrich v. State*, 19 Ark. App. 62, 716 S.W.2d 777 (1986). Meanwhile, the good-faith exception has been applied to validate searches in sixteen published opinions. *See George v. State*, 358 Ark. 269, 189 S.W.3d 28 (2004); *Feland v. State*, 355 Ark. 573, 142 S.W.3d 631 (2004); *Yancey v. State*, 345 Ark. 103, 44 S.W.3d 315 (2001); *Moya v. State*, 335 Ark. 193, 981 S.W.2d 521 (1998); *Sims v. State*, 333 Ark. 405, 969 S.W.2d 657 (1998); *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996); *State v. Blevins*, 304 Ark. 388, 802 S.W.2d 465 (1991); *Starr v. State*, 297 Ark. 26, 759 S.W.2d 535 (1988); *Jackson v. State*, 291 Ark. 98, 722 S.W.2d 831 (1987); *Hampton v. State, supra; Loy v. State, supra; Crain v. State, supra; Davidson v. State*, 76 Ark. App. 464, 68 S.W.3d 331 (2002); *Sanders v. State*, 76 Ark. App. 104, 61 S.W.3d 871 (2001); *Wray v. State*, 69 Ark. App. 170, 11 S.W.3d 9 (2000); *Carson v. State*, 21 Ark. App. 249, 731 S.W.2d 237 (1987). This number does not include seven additional published cases where the appellate court found that the warrant was supported by an affidavit showing probable cause but stated that it would have validated the search pursuant to the good-faith exception. *See Moore v. State*, 297 Ark. 296, 761 S.W.2d 894 (1988); *Watson v. State*, 291 Ark. 358, 724 S.W.2d 478 (1987); *Chrobak v. State*, 75 Ark. App. 281, 58 S.W.3d 387 (2001); *Sossamon v. State*, 31 Ark. App. 131, 789 S.W.2d 738 (1990); *Brannon v. State*, 26 Ark. App. 149, 761 S.W.2d 947 (1988); *McDaniel v. State*, 20 Ark. App. 201, 726 S.W.2d 688 (1987); *Vanderkamp v. State*, 19 Ark. App. 361, 721 S.W.2d 680 (1986).

When the good-faith "exception" to the general rule applies in twenty-three out of thirty-two cases, it is misleading for us to call it an exception. Just like the warrant requirement, which "[has] become so riddled with exceptions that it was basically unrecognizable," *Acevado*, 500 U.S. at 582 (Scalia, J., concurring), the Fourth Amendment's exclusionary rule, post-*Leon*, has been swallowed to the point where it only operates to protect the public in rare instances.[2] An exception to a rule is supposed to be

---

[2] Despite the opportunity to limit *Leon*'s detrimental effect to the Fourth Amendment, the Arkansas Supreme Court recently expanded its scope. In *Arizona v. Evans*, 514 U.S. 1 (1995), the United States Supreme Court extended the good-faith exception to cover

"[s]omething that is excluded from a rule's operation." *Black's Law Dictionary* 604 (8th ed. 2004). However, when the good-faith exception (1) renders powerless so much of the exclusionary rule as to make the original rule inapplicable more times than not, and (2) has narrowly-applied exceptions of its own, the "exception" has supplanted the rule.

The resulting flawed logic behind the good-faith exception has led to predictably flawed logic in Arkansas case law. Several cases cite *Leon* as the rule rather than the exception and apply it without conducting probable-cause analysis. *See, e.g., Echols v State, supra; State v. Blevins, supra; Starr v. State, supra; Partin v. State*, 22 Ark. App. 171, 737 S.W.2d 461 (1987) (finding probable cause but analyzing the facts under *Leon* first); *Carson v. State, supra*. The principal opinion is the most recent result of that unfortunate logic. Because *Leon* is the exception, it should not be considered, nor even discussed, until the court concludes that the search warrant was not supported by probable cause. If probable cause is found, then there is no need to consider the good-faith exception and to apply the *Leon* analysis. Yet, the principal opinion begins its analysis by citing *Leon* principles *before* citing principles for determining the validity of the search warrant affidavit, the principles used to dispose of this case. Today's decision is a clear example of how courts conflate probable-cause and *Leon* analyses and the consequences for the fundamental civil liberties that are implicated when they do so.

The flawed logic of *Leon* has also taken away from the primary purpose of the exclusionary rule: deterrence. The exclusionary rule was created to give the government an incentive to be mindful of a person's constitutional rights. Without the good-faith exception, police officers would know that misjudgments related to search warrant affidavits would be disfavored and result in seized items being excluded as incriminatory evidence. Thus, the exclusionary rule would have its full deterrent effect and the Fourth

---

reliance on mistakes by any court employee. In *Hoay v. State*, 348 Ark. 80, 71 S.W.3d 573 (2002), the Arkansas Supreme Court, in reliance on *Evans*, remanded a case for a determination of whether a recordkeeping mistake resulting in the arrest and search of the appellant was due to a police error or a court error, stating that if it was the result of a court error, the good-faith exception would apply. In doing so, our supreme court refused to strengthen the protection needed by Arkansas residents against unreasonable searches and seizures. *See* Note, Hoay v. State: *A Look at the United States Supreme Court's and Arkansas's Misapplication of the Exclusionary Rule and Good Faith Exception*, 57 ARK. L. REV. 993 (2005).

Amendment would be vindicated. Because of the good-faith exception, however, police have little interest in protecting constitutional rights:

> [I]n situations where police officers reasonably (but mistakenly) believe that their planned conduct satisfied Fourth Amendment requirements — presumably either (a) because they are acting on the basis of an apparently valid warrant, or (b) because their conduct is only later determined to be invalid as a result of a subsequent change in the law or the resolution of an unsettled question of law — then such officers will have no reason to refrain from conducting the search and the exclusionary rule will have *no* effect.

*Leon*, 468 U.S. at 952 (Brennan, J., dissenting) (emphasis added).

It appears to have escaped notice that, thanks to the *Leon* holding, the Fourth Amendment is the only provision in the Bill of Rights with a "good-faith" exception. Appellate courts reverse and remand when incriminating statements are given involuntarily or without the advice of counsel contrary to the Sixth Amendment; when defendants are not informed of their rights under the Fifth Amendment; when a defendant is subjected to double jeopardy; or when a court imposes a cruel or unusual punishment. These reversals occur without subjecting the governmental conduct that violates constitutional rights to good-faith analysis. If the right to be free from unreasonable searches and seizures is truly fundamental to being a free society, the police should not be judicially excused to violate that right by findings that unreasonable searches and seizures can somehow be conducted in "good faith."

One day, I hope to read an opinion that refers to the good-faith exception to the exclusionary rule as an aberration in the law on par with the decisions in the *Dred Scott v. Sanford*, 60 U.S. (How.) 393 (1856) and *Plessy v. Ferguson*, 163 U.S. 537 (1896). The Fourth Amendment is supposed to protect citizens from unreasonable search and seizure and is not part of the Constitution for the convenience of the government. *See Mc-Donald v. United States*, 335 U.S. 451 (1948) (reversing conviction on Fourth Amendment grounds where no reason, except the inconvenience of the officers and a delay in preparing papers, explained the officer's failure to seek a search warrant); *United States v. Taylor*, 934 F.2d 218 (9th Cir. 1991) (noting that an individual's interest outranks government convenience in balanc-

ing Fourth Amendment interests). Requiring valid search warrants and probable cause may make it more difficult for the government to find incriminating evidence of criminal conduct; however, "[i]t is the loss of that evidence that is the 'price' our society pays for enjoying the freedom and privacy safeguarded by the Fourth Amendment." *Leon*, 468 U.S. at 941 (Brennan, J., dissenting).

At present, the good-faith "exception" demonstrates that the judicial branch, whose members are sworn to interpret and apply the Constitution to uphold and protect individual liberties, has lost its vigilance for freedom and the political will to act as a check on abusive police practices. We are, sadly, in danger of becoming a society where individual liberties exist at the convenience and discretion of policing practices, thereby becoming more of a police state and less of a free society. I am obliged to follow the holdings of our state supreme court regarding the good-faith "exception." However, I refuse to go quietly into that night.